IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


MICHAEL MARCAVAGE,                :    CIVIL ACTION
                                  :    NO. 09-2477
          Plaintiff,             :
                                  :
     v.                           :
                                  :
CITY OF PHILADELPHIA,             :
     et al.,                      :
                                  :
          Defendants.            :



M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        MARCH 31, 2011


## I.    INTRODUCTION

        Plaintiff Michael Marcavage ("Plaintiff" or

"Marcavage") initiated this § 1983 action against the City of

Philadelphia ("the City") and individual Defendants William

Fisher ("Captain Fisher"), a captain in the Philadelphia Police

Department, Craig Smith ("Sergeant Smith"), a sergeant in the

Philadelphia Police Department, Officer Stuski, Officer Brown,

Officer Wiggins, and Sergeant Demalto (collectively,

"Defendants").

        Defendants bring a Motion for Summary Judgment as to

all Counts of Plaintiff's Amended Complaint and Plaintiff brings

a Motion for Partial Summary Judgment as to Plaintiff's First
Amendment claims.  For the reasons set forth below, the Court
will grant Defendants' Motion for Summary Judgment on all Counts
and deny Plaintiff's Motion for Partial Summary Judgment.


## II.  BACKGROUND

On June 2, 2009, Plaintiff initiated this § 1983 action
in this Court[1] alleging that Defendants violated his First,
Fourth, and Fourteenth Amendment rights by interfering with his
"open-air" preaching of evangelical Christian principles on the
streets of Philadelphia.[2]  Additionally, Plaintiff alleges a
violation of Pennsylvania's Religious Freedom Protection Act.[3]

---

[1]      Plaintiff has brought nearly identical claims against
the City of Philadelphia, Captain Fisher, and other members of
the Police Department's Civil Affairs Unit in numerous past
suits.  See Startzell v. City of Philadelphia, 533 F.3d 183, 199
(3d Cir. 2008); see also Marcavage v. City of Philadelphia, Civ.
No. 04-4741, 2006 U.S. Dist. LEXIS 55643 (E.D. Pa. Aug. 3, 2006);
see also Marcavage v. City of Philadelphia, Civ. No. 04-4741,
2006 U.S. Dist. LEXIS 96033 (E.D. Pa. Dec. 4, 2006); see also
Marcavage v. City of Philadelphia, 271 F. App'x. 272 (3d Cir.
2008).

[2]      In his complaint, Plaintiff states that, as a devout
Christian, it is his duty to evangelize and spread his religious
message with others who have joined his ministry, Repent America.
They do this through by "open-air preaching, distributing Gospel
literature, individual conversation, sidewalk
ministering/counseling, and the displaying of signs/banners
relating to the saving power of Jesus Christ."  (See Pl.'s Compl.
¶ 19.)

[3]      Specifically, Plaintiff brings the following eight
causes of action:

          Count I:          Free Speech, in violation of the First

71 Pa. Cons. Stat. Ann. § 2401, et seq.  Plaintiff seeks

declaratory judgment, permanent injunctive relief, nominal

damages, compensatory damages, and punitive damages.  (See Pl.'s

Compl. ¶ 6.)

On March 22, 2010, Defendants filed their answer to

Plaintiff's Amended Complaint.  Defendants denied Plaintiff's

allegations and raised several affirmative defenses, including

that Plaintiff has failed to state a claim upon which relief may

be granted and that Defendants are entitled to qualified

immunity.

---

|  |  |
|---|---|
|  | Amendment |
| Count II: | <u>Equal Protection</u>, in violation of the Fourteenth Amendment |
| Count III: | <u>Free Exercise</u>, in violation of the First Amendment |
| Count IV: | <u>Freedom of Travel / Due Process</u>, in violation of the Fifth Amendment |
| Count V: | <u>Right of Privacy / Right to be Left Alone</u>, in violation of the Fourteenth Amendment |
| Count VI: | <u>Unreasonable Seizure</u>, in violation of the Fourth Amendment |
| Count VII: | <u>Unreasonable Force</u>, in violation of the Fourth Amendment |
| Count VIII: | <u>Pennsylvania's Religious Freedom Protection Act Violation</u> |

(<u>See</u> Pl.'s Compl. ¶¶ 91-143.)

On May 3, 2010, Plaintiff filed a Motion for Partial Summary Judgment as to his First Amendment claims.  On June 11, 2010, Defendants filed a Motion for Summary Judgment as to all Counts of Plaintiff's Amended Complaint.  Both summary judgment motions are currently before the Court.

## III. DISCUSSION

Defendants bring a Motion for Summary Judgment, arguing that Plaintiff's claims fail as a matter of law as Plaintiff's claims cannot survive summary judgment because (1) Plaintiff failed to establish that, through custom, policy, or practice, the City of Philadelphia exhibited "deliberate indifference" to his constitutional rights; (2) Plaintiff failed to demonstrate that the police officers, individually, violated his civil rights by separating him from groups with opposing views; and (3) individual defendants are entitled to qualified immunity.  (See Defs.' Mot. Summ. J.)

The Court will address the relevant legal standards. Next, taking the facts in the light most favorable to the Plaintiff, the Court will address each of Plaintiff's claims.

A.   Summary Judgment Standard Under Rule 56

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The "'mere existence' of disputed facts will not result in denial of a motion for summary judgment; rather[,] there must be 'a genuine issue of material fact.'"  Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)).  A fact is "material" if its existence or non-existence would affect the outcome of the suit under governing law.  Anderson, 477 U.S. at 248.  An issue of fact is "genuine" when there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party regarding the existence of that fact.  Id. at 248-49.  "In considering the evidence, the court should draw all reasonable inferences against the moving party."  El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007).

In undertaking this analysis, the court views the facts in the light most favorable to the nonmoving party.  "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party."  Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)).

"Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by showing-that

is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004) (quoting Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001)).  Once the moving party has discharged its burden, the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in [Rule 56]--set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

B.    Section 1983 Claims

Section 1983 of Title 42 of the United States Code provides a cause of action for an individual whose constitutional or federal rights are violated by those acting under color of state law.[4]  See generally Gonzaga Univ. v. Doe, 536 U.S. 273,

───────────────

[4]    Section 1983 provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

284-85 (2002).  The threshold inquiry in a § 1983 suit is whether

the plaintiff has been deprived of a right "secured by the

Constitution and laws" of the United States.  Baker v. McCollan,

443 U.S. 137, 140 (1979).  Absent a violation of a right secured

by the Constitution or the laws of the United States, there can

be no cause of action under § 1983.  Reichley v. Pa. Dep't. of

Agric., 427 F.3d 236, 244 (3d Cir. 2005) (citing West v. Atkins,

487 U.S. 42, 48 (1988)).


  C. First Amendment Claims (Counts I and III)

   In Count I, Plaintiff alleges a violation of his right

to free speech.  In Count III, Plaintiff alleges a violation of

his right to free exercise of religion.  Plaintiff claims that by

restricting his movements on public sidewalks at gay pride

events, Defendants are employing a policy, custom, or practice,

that violated his First Amendment right to free speech and free

exercise of religion.

   Defendants, in opposition, contend that Plaintiff fails

to establish a violation of his First Amendment rights because

(a) neither Captain Fisher nor Sergeant Smith participated in the

November 15, 2008 event; (b) the ability to voice his message to

Gay Pride Event attendees was not restricted where (i)

---

  42 U.S.C. § 1983.

Defendants' actions were content neutral, (ii) Plaintiff's

relocations were a "narrowly tailored" means of ensuring public

order and safety, (iii) Plaintiff had adequate channels of

communication at the site of his relocation; (c) Plaintiff's

complaint alleges the same facts as those presented (and

dismissed) in <u>Startzell v. City of Philadelphia</u>; (d) Defendants

were permitted to remove counter-protesters from the march route

on Mary 3, 2009; (e) Plaintiff failed to establish that

Defendants denied him of equal protection; and (f) individual

Defendants are entitled to qualified immunity.  (<u>See</u> Defs.' Opp'n

to Pl.'s Mot. Summ. J.)  As such, Defendants argue that their

Motion for Summary Judgment should be granted.

Plaintiff alleges that Defendants violated his

protected First Amendment rights at the following four events[5]:

---

[5]    Material facts found by the Court are based on the
Plaintiff's deposition testimony as well as the video tapes taken
by the Plaintiff and drawing all reasonable inferences in favor
of the Plaintiff.  <u>See</u> <u>generally</u> <u>Scott v. Harris</u>, 550 U.S. 372
(2007).

(1) June 10, 2007 Pridefest[6]; (2) June 8, 2008 PrideFest[7]; (3) November 15, 2008 Proposition 8 Demonstration[8]; and (4) May 3, 2009 Equality Forum.[9]

All four incidents, although slightly different in

---

[6] Marcavage wished to preach to members of the crowd, without any restrictions, as they entered the event. Instead, Captain Fisher restricted Marcavage and his group members to standing approximately twenty five feet from the entrance. Later, they were allowed closer to about fifteen feet from the entrance once the line was shorter. Marcavage and his group carried signs, amplified sound, and distributed leaflets. Participants spoke with them while some participants were hostile to him and his group. (See Pl.'s Video of the Event, Pl.'s Mot. for P. Summ. J. Ex A.)

[7] The facts of this incident are almost identical to those above at PrideFest 2007. (See Pl.'s Video of the Event, Pl.'s Mot. for P. Summ. J. Ex B.)

[8] Participants were at City Hall protesting the passage of California's Proposition 8. Marcavage and his group used amplified sound to share the message of "turning to Christ." A crowd "began to gather around" Marcavage and his group, and members of this crowd were "shouting" and "agitated." Civil Affairs officers "kept telling [Marcavage and his group, that they] needed to move." Marcavage told the officers "I'm going to speak" and Officers Stuski, DeMalto, Brown, and Wiggins physically moved Marcavage away from the crowd, telling Marcavage that he was being moved because the crowd was getting upset and the police could not protect him. Marcavage was moved from the middle of the crowd to the "outskirts" of the crowd, about forty to fifty feet away. (See Marcavage Dep. 66:21 - 80:24.)

[9] Marcavage and his group were preaching alongside a march of participants of the Equality Forum. Marcavage and his group carried signs and had an amplified voice system. One of the group members, James Gardner, began preaching on an amplified system while walking amongst the marchers. One of the marchers began to get in a shoving match with Gardner and Civil Affairs officers removed Gardner from the march back onto the sidewalk. (See Pl.'s Video of the Event, Pl.'s Mot. for P. Summ. J. Ex C.)

fact, followed the same pattern.  Marcavage and his group's message was aimed at gay pride events where they condemned homosexuality and encouraged participants of the events to abandon homosexual behavior.  In all instances, Marcavage and his group preached to a crowd that reacts strongly to his message. These reactions include: shouting at, debating with, trying to surround, and getting physically close to Marcavage and members of his group.  Civil Affairs officers or Captain Fisher separate Marcavage and his group from the crowd despite Marcavage's protestation.  From their location, Marcavage and his group are allowed to preach to the crowd with amplified sound, speak with participants passing by, hand out leaflets, and carry large signs.[10]

To determine whether First Amendment free speech rights have been violated, the Supreme Court has espoused a three pronged analysis.  First, whether the speech is "protected by the First Amendment;" second, determining "the nature of the forum;" and third, whether the government's "justifications for exclusion from the relevant forum satisfy the requisite standard." Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 797 (1985); Startzell v. City of Philadelphia, 533 F.3d 183, 192 (3d Cir. 2008).  "The burden is on the City to demonstrate the constitutionality of its actions.  Startzell, 533 F.3d at

---

[10]     See supra nn. 6-9.

201.

It is not contested that open-air religious preaching is speech that is protected by the First Amendment. Also, all four incidents occurred at locations that qualify as "public forums" during gay pride events that were held on public streets, sidewalks, and parks throughout Philadelphia, Pennsylvania. <u>Startzell</u>, 533 F.3d at 196 (finding that streets and sidewalks are "an undisputed quintessential public forum."). Thus, here, the real issue is the application of the third prong of the test. That is, whether the Defendants' justifications for excluding or relocating Marcavage from public forums to the perimeter of permitted gay pride events satisfy the requisite standard.

"Absent a compelling interest, speech in a public forum may not be regulated based upon content." <u>Eichenlaub v. Twp. of Indiana</u>, 385 F.3d 274, 280 (3d Cir. 2004). In general, the Third Circuit's guidance in <u>Startzell</u> is relevant here as the facts and parties in this case, mirror those in <u>Startzell</u>. In <u>Startzell</u>, Plaintiffs were "counter-protestors [that] were members of Repent America led by Michael Marcavage, who entered the area assigned to OutFest with large signs, microphones, bullhorns, and musical instruments, seeking to proclaim their message that homosexuality is a sin." <u>Startzell</u>, 533 F.3d at 196. Additionally, "[w]hen the Marcavage group disobeyed a police directive to move to a

less disruptive location, they were arrested." Id.

In holding that Plaintiffs' First Amendment rights were not violated in Startzell, the Third Circuit stated:

> The right of free speech does not encompass the right to cause disruption, and that is particularly true when those claiming protection of the First Amendment cause actual disruption of an event covered by a permit. The City has an interest in ensuring that a permit-holder can use the permit for the purpose for which it was obtained. This interest necessarily includes the right of police officers to prevent counter-protestors from disrupting or interfering with the message of the permit-holder. Thus, when protestors move from distributing literature and wearing signs to disruption of the permitted activities, the existence of a permit tilts the balance in favor of the permit-holders.

Id. at 198-99.

Here, the facts are almost identical to those in Startzell.[11] Marcavage, a Plaintiff in both cases, with other

---

[11] Plaintiff baldly asserts that the factual basis of this complaint is different than in Startzell, with no supporting evidence or argument. (See Pl.'s Opp'n to Defs.' Mot. Summ. J. 35-36.) Similar to his actions underlying Startzell, Plaintiff disrupts peaceful gay pride events by walking through crowds of participants, shouting and holding up signs with similarly incendiary language as in Startzell. As such, Plaintiff's actions are deemed equally disruptive here. In further support, Plaintiff was permitted to remain, verbal and physical confrontations with event participants ensued. The only reason the facts do not perfectly align is because Defendants, in relocating or excluding Plaintiff, mitigated against those confrontations. (See Pl.'s Opp'n to Defs.' Mot. Summ. J. 39.)
As in Startzell, Plaintiff neither sought nor obtained a permit to "conduct any expressive activities" at any of the four events. 2007 U.S. Dist. LEXIS 4082, at *7. Further, Plaintiff's First Amendment claims bear the same failures as those in Startzell where the district court noted that Plaintiff "claim[s] a freedom of speech without limits." Id. at *8.

members of Repent America, counter-protested additional gay pride events.[12]  Once again, at each of the four events, Marcavage and his group members used large signs, microphones, and bullhorns, and engaged in argument with the crowd to get their message across.  Thus, as in <u>Startzell</u>, Marcavage does not have a First Amendment right without limits and the City has a legitimate interest in preventing Marcavage -- as a counter-protestor of a permitted event -- from interfering with the message of the permit holder[13] and ensuring the safety of both the participants as well as Marcavage and his group.

Further, Defendants applied reasonable restrictions on Marcavage.  In a public forum, time, place, and manner restrictions must be: "[1] justified without reference to the content of the regulated speech, . . . [2] narrowly tailored to serve a significant governmental interest, and . . . [3] leave

---

[12]  Plaintiff qualifies as a counter-protester as he targets gay pride events in order to counter the event's message with his message and reach out to "those trapped in the bondage of homosexuality with the hope and freedom that is found in Jesus Christ."  (Marcavage Dep. 22:2-22:12.)

[13]  Plaintiff does not contest the constitutionality of these permits nor does Plaintiff argue that the City approved permits in a discriminatory manner.  Plaintiff's argument that he was not permitted from entering the parade and was relocated based on his viewpoint is not factually or legally supported. <u>Startzell</u>, 533 F.3d at 201 (stating that "once the City issues a permit to Philly Pride for Outfest, it was empowered to enforce the permit by excluding persons expressing contrary messages.") (internal citations omitted).

open ample alternative channels for communication of the
information." <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791
(1989); <u>see</u> <u>also</u> <u>Startzell</u>, 533 F.3d at 200.

 First, Marcavage's relocations and exclusions from the
gay pride events were not based on the content of Plaintiff's
speech.  As in <u>Startzell</u>, restricting Marcavage's access and
movement, as a counter-protestor, in a permitted event at a
public forum does not mean that the City's actions were based on
Marcavage's particular viewpoint.  <u>Startzell</u>, 533 F.3d at 200.
Instead, the analysis is treated as a content-neutral time,
place, and manner restriction.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Diener v. Reed</u>, 77
F. App'x. 601, 608 (3d Cir. 2003) (finding that the "exclusivity
aspect" of a permitting scheme allows counter-protestors to be
excluded without a constitutional violation); <u>Cox v. New
Hampshire</u>, 312 U.S. 569 (1941) (holding that permitting schemes
are a long-recognized content-neutral method to allocate free
speech rights in a public forum).  Defendants did not restrict
Marcavage because they disagreed with his view.  Rather, they
restricted Marcavage because his message was the opposite message
of the event.

 Second, the restrictions on Marcavage's speech were
narrowly tailored to serve a significant government interest.
"'As a general matter, it is clear that a State's interest in

protecting the safety and convenience of persons using a public forum is a valid governmental objective.'" <u>Startzell</u>, 533 F.3d at 201 (quoting <u>Heffron</u>, 452 U.S. at 650) (other citations omitted). Further, "'restrictions on the time, place, or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech.'" <u>Startzell</u>, 533 F.3d at 201 (quoting <u>Ward</u>, 491 U.S. at 797). "There is no need to determine if the restrictions are the least intrusive, but only whether the regulation 'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" <u>Startzell</u>, 533 F.3d at 202 (quoting <u>Ward</u>, 491 U.S. at 799).

Here, the Defendants had a substantial government interest in restricting Marcavage's speech. <u>Startzell</u>, 533 F.3d at 201 ("[I]t is clear that a State's interest in protecting the safety and convenience of persons using a public forum is a valid governmental objective.'"). Defendants separated Marcavage and his group members from the permitted group for the interest of protecting Marcavage and to maintain public order, which is a significant interest. Defendants also had an interest in keeping Marcavage from disrupting the flow of both pedestrian and vehicular traffic as Marcavage was often asking that he and his

group be able to congregate at the entrance to the event or in the street.

Further, Defendants' restrictions were narrowly tailored to serve these substantial government interests. Marcavage was not prohibited from speaking and was, at all times, within close proximity to the gay pride events, often only fifteen to twenty feet from where he wished to be. Indeed, Marcavage and other members of Repent America, continued to use a bullhorn, carry large signs, and engage in many conversations with participants of the events. Thus, the Defendants' actions in restricting Marcavage's speech were narrowly tailored to a significant interest.

Third, there were sufficient alternative avenues for the expression of Plaintiff's protected speech which Plaintiff fully utilized. When imposing time, place, or manner restrictions on free speech, there must remain alternative avenues for one to express his or her free speech. Ward, 491 U.S. at 791; see also Startzell, 533 F.3d at 200. Restrictions should leave open "ample alternative channels of communication." Startzell, 533 F.3d at 201 (citing Ward, 491 U.S. at 791). However, "'an alternative is not ample if the speaker is not permitted to reach the intended audience.'" Startzell, 533 F.3d at 202 (quoting Bay Area Peace Navy v. United States, 914 F.2d

1224, 1229 (9th Cir. 1990).

At each of these events, Marcavage and other members of Repent America were asked to stand at the perimeter of the permitted gay pride events. Marcavage was still able to share his message to his intended audience, the participants of the gay pride events. Marcavage was still able to use his bullhorn and his large signs. Defendants merely contained Marcavage and his group members to a physical area to be able to protect them and monitor interactions between them and the event participants to maintain public safety and order. As evidenced by the videos, Marcavage was still able to engage in conversation, pass out literature, and be heard by passing participants.

Based on the valid permitting scheme and the reasons set forth in Startzell, Defendants had authority to reasonably remove, relocate, or exclude counter-protestors. 533 F.3d at 199. As Marcavage was targeting gay pride parades, whose collective expression of gay equality and pride was contrary to his, Defendants acted without violating Marcavage's First Amendment or free speech rights when relocating and restricting Plaintiff's movement and entry. The restrictions of Marcavage's entry and location were narrowly tailored solutions to serve a substantial government interest to maintain safety and public order.

Thus, there being no genuine issue of material fact and as the Defendants have shown they are entitled to judgment, Defendants' Motion for Summary Judgment as to Counts I and III will be granted.[14]

D.  <u>Fourth Amendment Claims (Counts VI and VII)</u>

In Count VI, Plaintiff alleges a violation of his right to be free from unreasonable seizure.  In Count VII, Plaintiff alleges a violation of his rights protecting him from excessive force.  Specifically, Plaintiff argues that being physically removed from the Equality Forum march, and subsequent physical

---

[14]  Plaintiff also moves for partial summary judgment on "the issue of the violation of his rights to free speech and free exercise of religion," Counts I and III.  (Pl.'s Mot. for P. Summ. J. 27.)  In his complaint, Plaintiff argues that by being restricted from free-movement around certain public areas (i.e., public streets and sidewalks) where he intended to preach, hand-out literature, and minister to people attending gay pride events, Defendants engaged in a policy, custom, and practice of violating his rights to free speech and free exercise of his religious beliefs, secured by the First Amendment.  (<u>See</u> Pl.'s Compl. ¶ 2.)

In sum, Plaintiff argues that Defendants restricted his speech based on its content providing justifications that were not "narrowly tailored" in direct contravention of the First Amendment and that such "viewpoint discrimination" is unconstitutional.  (<u>See</u> Pl.'s Mot. Summ. J. 4.)  As such, Plaintiff seeks partial summary judgment on the First Amendment violations of his right to free speech and free exercise of religion on Counts I and III.

Where cross motions are pending, each shall be adressed separately by the Court.  As to Plaintiff's cross Motion for Partial Summary Judgment, the Court finds that Plaintiff has failed to show the absence of a genuine issue of material fact and that he is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

restraint by Captain Fisher and Sergeant Smith violated his civil rights.

Plaintiff's Fourth Amendment claims arise out of an incident between civil affairs officers and Plaintiff at the Equality Forum on May 3, 2009 briefly discussed above. Plaintiff has submitted video evidence documenting this interaction. (See Pl.'s Video of the Event, Pl.'s Mot. for P. Summ. J. Ex C.) Thus, the Court relies heavily on video evidence provided by Plaintiff, as well as Plaintiff's deposition testimony, and makes all reasonable inferences in Plaintiff's favor.[15]

The May 3, 2009 incident was another annual gay pride event.[16] Jake Gardner, one of Marcavage's group members, joined

---

[15] During oral argument Plaintiff stated that the video captured the claim and that no use of force occurred that cannot be seen in the video. Similarly, Marcavage's statements in his deposition regarding the incident are consistent with this assertion. (See Marcavage Dep. 83:20 - 90:21.)

[16] This event was the Equality Forum, "concerning homosexuality" and "the need for hate crime legislation," and the event organizers had a permit for this event as well. (Marcavage Dep. 86:6-11, 83:20-22.) Marcavage and his group were there "to reach out to those trapped in the bondage of homosexuality." (Id. at 84:5-6.) They had signs with biblical messages and were "open-air preaching" with a PA system. (Id. at 84:7-13.) Event participants began to start an impromptu march down Market Street on their way to the event at Independence Hall. (Id. at 85:12-17.)

Marcavage's group, with their signs and PA system, began to march alongside the impromptu march. (Id. at 85:19-20.) As shown in the video, one of Marcavage's group members, Jake Gardner, is heard speaking on a PA system saying "please repent before it is too late" and "you have a false conception of the Christ of the bible." Marchers are heard yelling things at Marcavage and his group like "hell, hell."

the march in progress and, while speaking on his PA system and weaving between march participants, he got into a shoving match with one of the march's participants.  As a result, Captain Fisher and another officer physically removed Gardner from the march and onto the sidewalk.

At this point, Marcavage approached the officers and said "wait a minute, wait a minute, what's going on here.  You can't take us out of the parade."  In response, Sergeant Smith said "you know what, I can help you, come over here" and he grabbed Marcavage by the shoulder and physically moved him approximately five feet from the street and onto the sidewalk.

Seconds later, Marcavage reached down and was then holding a silver object in his hands.  A scuffle ensued between Marcavage and approximately four to five officers.  Sergeant Smith held Marcavage back by placing his right arm around Marcavage's chest and neck, and his left arm around Marcavage's left arm.  The other officers were trying to get the "silver object" out of Marcavage's hand, while Marcavage kept shouting.[17] Contemporaneous with the scuffle, some officers were holding back Gardner from involvement in the scuffle between Marcavage and the

---

[17]    Marcavage's deposition testimony is consistent with the video and the facts described here.  According to Marcavage, "as I attempted to turn my camera on, my video camera, [Sergeant Smith] then placed me in a choke hold."  (Id. at 87:1-3.) Further, Marcavage describes the struggle as "they put me in this choke hold and started trying to pry the video camera out of my hands."  (Id. at 88:12-14.)

officers, while other officers were holding back members of Marcavage's group.  The scuffle between Marcavage and the officers lasted approximately ten seconds.[18]

Once the silver object, which turned out to be a camera, was taken from Marcavage's hand, Sergeant Smith released his hold and placed his hand on Marcavage's back for an additional five seconds while Marcavage argued with Captain Fisher.  After those five seconds, Seargent Smith removed his hand from Marcavage's back and Marcavage's camera was given back to him.  Marcavage and Gardner continued to argue with Captain Fisher about participating in the march for another sixty seconds.  Soon after, the officers and the group members separated and walked away.

(1)  Unreasonable Seizure

In Count VI, Plaintiff alleges he was seized by Defendants in violation of his Fourth Amendment rights.  Only a "minimal level of objective justification" is necessary for an officer to stop someone for a short detention.  United States v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006).  In evaluating the appropriateness of a detention, "[courts] must consider 'the

---

[18]    Although a civil affairs officer regrettably uses an umbrella to block from the camera's view some of the incident, Plaintiff conceded at oral argument that the video footage captures the entire event at issue and that he does not claim that there are any actions by the officers that were hidden by the umbrella that would support his claim for excessive force. Additionally, Marcavage's deposition testimony is consistent with what is seen on the video.  (Marcavage Dep. 86:16-89:9.)

totality of the circumstances--the whole picture.'"  United
States v. Sokolow, 490 U.S. 1, 8 (1989)(quoting United States v.
Cortez, 449 U.S. 411, 417 (1981)).  Each stop must be both
"justified at its inception" and "reasonably related in scope to
the circumstances which justified the interference in the first
place."  Terry v. Ohio, 392 U.S. 1, 20 (1968).  An officer is
entitled to draw reasonable inferences from the facts in light of
his experience.  Id. at 27.

On the other hand, the Supreme Court has recognized
that "if an investigative stop continues indefinitely, at some
point it can no longer be justified as an investigative stop."
United States v. Sharpe, 470 U.S. 675, 685 (1985).  In addition
to the length of the suspect's detention, the Court must also
consider the law enforcement purposes to be served by the stop.
United States v. Hensley, 469 U.S. 221, 228-29 (1985).

Here, although Marcavage and his group were
demonstrating alongside a march affiliated with the Equality
Forum using a PA system, signs, and video camera, Civil Affairs
officers allowed Marcavage and his group to continue to counter-
protest until it became disruptive and physical.  Once there was
a physical interaction between a member of Repent America, Jake
Gardner, and a participant of the march, Defendants removed
Gardner from the march.  It was Marcavage who approached
Defendents to protest Gardner's removal from the march.  It was

then that Sergeant Smith grabbed Marcavage by the jacket and moved him out of the street and onto the sidewalk.

While it is clear that this was a seizure, the seizure was not unreasonable. There was reasonable articuable suspicion that Gardner was involved in an unlawful act because he was involved in a physical altercation with a march participant. Defendants needed only a "minimal level of justification" to stop Marcavage when considering the "totality of the circumstances." Sokolow, 490 U.S. at 8; Delfin-Colina, 464 F.3d at 396. Thus, it follows that when Marcavage approached the group that was with Gardner and started arguing with police that the police could reasonably stop Marcavage as well if for no other reason than to control the situation.

Additionally, the seizure did not last for much more than a minute which certainly does not qualify as an indefinite seizure under <u>Sharpe</u>. The stop was also reasonable in scope, as the stop ended once the situation with Marcavage, his group, the crowd, and the officers was stabilized. In considering law enforcement purposes served by the stop, as directed under <u>Henley</u>, the Court finds that briefly stopping Marcavage served a significant law enforcement purpose of maintaining public safety where Marcavage approached Defendants while they were in the middle of stopping and confronting Gardner, his associate, who had just been involved in a physical altercation.

Thus, Defendants having shown the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law, Defendants' motion for summary judgment as to Count VI will be granted.

### (2)  Unreasonable Force

In Count VII, Plaintiff alleges that he was subject to unreasonable force in violation of his Fourth Amendment rights. Plaintiff argues that by forcibly removing him from the Equality Forum march and placing him in a "choke hold" he was subjected to excessive force in violation of his civil rights.  Defendants oppose and argue that Plaintiff was removed only after his conduct threatened the peace and public order of the event.

The Fourth Amendment prohibits the use of unreasonably excessive force.  Graham v. Connor, 490 U.S. 386, 394-95 (1989). The police may use force "reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a] stop." United States v. Hensley, 469 U.S. 221, 235 (1985).  A "court should defer to the officer's observations and judgments in reviewing the totality of the circumstances because officers 'draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" United States v. Focareta, 283 F. App'x. 78, 83 (3d

Cir. 2008)(quoting <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002) (internal citations omitted)).

Whether a police officer used excessive force must be determined using a reasonableness test, giving careful attention to the facts and circumstances of each particular case. Graham, 490 U.S. at 396. These facts and circumstances include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.

The "'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. . . . An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id. at 397 (internal citations omitted).[19]

The "'reasonableness' of a particular use of force therefore must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

---

[19] Even if Marcavage argued that Defendants had a malicious intent this would not be relevant because this is an objective, not subjective, test.

hindsight."  Id. at 396.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation."  Id. at 396-97.

Accordingly, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'"  Id. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).  "Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished."  Lamont ex rel. Estate of Quick v. New Jersey,  -- F.3d --, 2011 WL 753856, *6 (3d Cir. 2011) (citing Lytle v. Bexar County, 560 F.3d 404, 413 (5th Cir. 2009) (observing that "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased"); Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2004) ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."))(other citations omitted).

Here, Defendants used force "reasonably necessary to protect their personal safety and to maintain the status quo." Hensley, 469 U.S. at 235.  It was reasonable that Sergeant Smith

used minimal physical force to remove Marcavage from the parade and bring him onto the sidewalk (five feet away) in light of the circumstances which include: a physical altercation involving one of Marcavage's colleagues, Marcavage's approach to an on-going police seizure of Gardner, Gardner was resisting, and Marcavage's approach was argumentative.

Further, Sergeant Smith used reasonable force by employing a loose choke hold on Marcavage while Marcavage was reaching for an unknown object (the "silver object"), as safety is a primary concern for officers that are engaged in seizing an individual. This use of force was minimal as Defendants did not employ any form of weapon but instead Sergeant Smith held Marcavage back while other officers attempted to remove the object from Marcavage's hand.[20] This hold was also minimal force as Marcavage did not seem to struggle to remain standing and he was able to shout during the struggle.

Recently, the Third Circuit reiterated that officers may protect themselves when the person they have stopped reaches for an unknown object. Lamont, -- F.3d --, 2011 WL 753856, *6 (finding no constitutional violation for firing initial shots at a man that reached for a crack pipe in his waist ban)(citing Thompson v. Hubbard, 257 F.3d 896, 899 (8th Cir. 2001)(finding no constitutional violation because officer was not required to wait

---

[20]    That the "silver object" turned out to be a camera is of no moment to the analysis.

until he set eyes upon a weapon before employing deadly force when individual turned and moved as though to draw a weapon))(other citations omitted).

Although these cases involve more intense situations and the use of deadly force, they illustrate courts' recognition of the importance of ensuring police safety when a person reaches for an object.  These cases also lend support to a finding that Defendants' use of force was reasonable where they used the minimal force of holding Marcavage back with the use of Sergeant Smith's arms only, in order for the other officers to retrieve an unidentified object in Marcavage's hand.

Additionally, this struggle did not last longer than necessary as Sergeant Smith released Marcavage from the hold once the officers removed the object from his hand.  Under the totality of these circumstance, Defendants' use of force was constitutionally, objectively reasonable.[21]  Under these circumstances, no reasonable jury could find that Defendants' use of force during Marcavage's seizure was constitutionally unreasonable.

Thus, Defendants having shown the absence of a genuine issue of material fact and that they are entitled to judgment as

---

[21]     In the alternative, qualified immunity would apply to protect these Defendants from liability as a reasonable officer could believe that these actions did not violate clearly established law.

a matter of law, Defendants' motion for summary judgment as to Count VII will be granted.

      F.    <u>Fifth Amendment Claims (Count IV)</u>

      In Count IV, Plaintiff alleges a violation of his rights to freedom of travel and to due process.  Although originally plead as a Fifth Amendment claim, the Court will treat the claim as alleging a violation of Plaintiff's rights as protected by the Fourteenth Amendment.[22]  Here, Plaintiff claims that Defendants, by relocating or removing him from the incidents discussed herein, violated his right to freedom of travel.

      The Fourteenth Amendment provides a broad constitutionally protected right to one's freedom of travel.  <u>See City of Chicago v. Morales</u>, 527 U.S. 41, 54 (1999) ("an individual's decision to remain in a public place of his choice is . . . a part of his liberty . . .").  However, one does not have boundless rights to travel where he pleases in a manner disruptive of public, permitted events.  <u>See</u> <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 229 (3d Cir. 2006).  Further, to prove an equal protection claim, a plaintiff must prove that "(1) he was treated differently compared to similarly situated persons/entities; (2) that Defendants did so intentionally; and

_____

[22]    The Court does this per Plaintiff's request.  (<u>See</u> Pl.'s Opp'n to Defs.' Mot. Summ. J. 50 n.8.)

(3) that there was no rational basis for the treatment." Id.

Defendants had a rational basis for treating Marcavage differently because he was a counter-protestor whose interactions with the participants during the four incidents discussed above created public safety concerns. For his safety and for the preservation of the expressive activity of others, as a counter-protester, Marcavage's movement may be limited to serve a significant government interest.

Thus, Defendants have shown the absence of a genuine issue of material fact, and they are entitled to judgment as a matter of law. Defendants' motion for summary judgement on Count IV will be granted.

G. <u>Fourteenth Amendment Claims (Counts II and V)</u>

In Count II, Plaintiff alleges a violation of his right to equal protection under the law. Plaintiff argues that he was treated differently than the gay pride attendees and Ralph Nader volunteers because his movement was restricted movement while theirs was not. (<u>See</u> Pl.'s Opp'n to Defs.' Mot. Summ. J. 45-50.) In opposition, Defendants argue that since all four events were granted permitting schemes, Plaintiff's disruptive and unruly actions warranted either relocating, removing, or excluding him from the events, regardless of his viewpoint.

Again, <u>Startzell</u> is on point. In <u>Startzell</u>, the court

found that the plaintiffs were not categorized similarly to the Outfest attendees and Philly Pride volunteers and, as such, failed to demonstrate that they were subject to "selective treatment." 533 F.3d at 203. Here, Plaintiff again, as a counter-protestor, is not similarly situated to those participating in the permitted gay pride events. Thus, Plaintiff fails to demonstrate a violation of his Fourteenth Amendment right to counter-protest at the four gay-pride events.

In Count V, Plaintiff alleges a violation of his right to privacy and to be left alone, under the Fourteenth Amendment. Defendants only address this argument in their summary judgment motion to state that it will be interpreted as having been brought pursuant to the Fourteenth Amendment. In general, Defendants contend that as Plaintiff cannot prove that he was "similarly situated to other individuals who were permitted to move freely about the streets and sidewalks at the LGBT events" and cannot show that Defendants Captain Fisher and Sergeant Smith intended malice or bad faith towards him, he cannot be successful in proving a violation under the Fourteenth Amendment. (See Defs.' Mot. Summ. J. 20.) The Court agrees.

Thus, Defendants having shown the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law, Defendants' motion for summary judgement on Counts II and V will be granted.

## IV. CONCLUSION

For the reasons stated above, summary judgment will be entered for Defendants on all Counts.[23]

---

[23] As to Plaintiff's claim brought pursuant to the Pennsylvania Religious Freedom Protection Act, Plaintiff does not respond to Defendant's motion for summary judgment as to this count and stated at oral argument that this claim has been abandoned. Thus, Defendants' motion for summary judgment will also be granted as to Count VIII.